# Exhibit 1

IN IMPARTIAL UMPIRE PROCEEDINGS PURSUANT TO SECTION
302 OF THE TAFT-HARTLEY ACT AND THE
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION AND PACIFIC
MARITIME ASSOCIATION WELFARE TRUST

| | | |
|---|---|---|
| UNION TRUSTEES, | ] | Opinion and |
| | ] | Interim Decision |
| Complainants, | ] | |
| | ] | of |
| and | ] | |
| | ] | JOHN KAGEL |
| | ] | |
| EMPLOYERS' TRUSTEES, | ] | Coast Arbitrator |
| | ] | acting as Impartial Umpire |
| Respondents. | ] | August 19, 2013 |
| | ] | |
| | ] | Palo Alto, California |
| Re: Zenith American Solutions as TPA | ] | |

APPEARANCES:

For the Union Trustees: Robert S. Remar, Esq., Peter W. Saltzman, Esq., Lindsay Nicohlas, Esq., Leonard Carder, San Francisco

For the Employers' Trustees: Richard F. Liebman, Esq., Barren Liebman, Portland, OR, S. Bradley Perkins, Esq., Senior Counsel, PMA, San Francisco, D. Ward Kallstrom, Esq., Seyfarth Shaw, San Francisco

ALSO PRESENT:

Robert McEllrath, International President. Union Trustee
Ray Familathe, International Vice President, Union Trustee
Leal Sundet, Coast Committee Member, Union Trustee
Ray Ortiz, Jr., Coast Committee Member, Union Trustee
John Castanho, Benefits Specialist, ILWU

1

Mark Mascola, ILWU Local 13
Jeff Smith, ILWU Local 8
Daniel Imbagliazzo, ILWU Local 13
Cameron Williams, ILWU Local 19
Carl Rendell, ILWU Local 28
Paul Wieser, ILWU Local 98
Michael Podue, ILWU Local 63
Daniel Miranda, ILWU Local 94
Fred Gilliam, ILWU Local 91
Pete McEllrath, ILWU Local 92
Jerry Avila, ILWU Local 13 Health Benefits Officer
Julie Brady, ILWU Local 13
Ty Gorton, ILWU Area Welfare Director, Oregon
Sam Alvarado, ILWU Area Welfare Director, Southern CA
Joe Cabrales, ILWU Area Welfare Director, Northern CA
Nick Buckles, ILWU Area Welfare Director, Washington
Chris Viramontes, ILWU Local 13
Kirsten Donvan, ILWU CLD
Allen Fung, ILWU Local 34
George Romero, IO Pensioner
Sean Farley, ILWU Local 34
William Adams, ILWU International Secretary-Treasurer
Francisco Ponce De Leon, ILWU Local 13
Ed Ferris, ILWU Local 10
Melvin MacKay, ILWU Local 10
Russ Bargman, ILWU International Research Director
Renee Quintero, ILWU Local 10
Richard Mead, ILWU Local 10
Chris Hwang, Esq., Leonard Carder
Sara Tosdal, Esq., Leonard Carder
James McKenna, PMA CEO, Employer Trustee
Michael Wechsler, Esq., PMA CFO, Employer Trustee
Bob Stephens, APL, Employer Trustee
Steve Hennessey, COO PMA
Craig Epperson, Esq., General Counsel, PMA
Bettye Page-Wilson, Vice President, PMA
Chad Lindsay, Vice President, PMA
Julie Lyon, TC3
Art Shultz, Zenith American Solutions
Bill Mahon, Manon Consulting Group
Amanda Lu, Zenith American Solutions
Jose Angeles, Zenith American Solutions
Jill Felhaber, Buck Consultants

Phil Davidson, Milliman

TRUSTEES' DEADLOCKED MOTION:

> "Union Trustees move to replace Zenith American effective August 1, 2013, with BeneSys." (Tr. 24)

BACKGROUND:

After negotiations in 2008 between the bargaining parties resulted in an agreement to replace CIGNA as the Welfare Plan's third party administrator (TPA) to process medical claims, request for proposals (RFP) were issued in 2010. In a process overseen by plan consultant Milliman, the Trustees deadlocked over whether to choose Zenith American Solutions (Zenith) or BeneSys as successor TPA to be effective January 1, 2013.

The undersigned, as Impartial Umpire pursuant to Section 302 of the Taft-Hartley Act, was required to choose between the two, choosing Zenith in June 2012. (Union Trustees' Ex. A.1) At that time, according to summaries prepared by Milliman, Zenith had stated it would staff its Coastwise claims office (CCO) with experienced, trained Zenith personnel (Tr. 365), a key component of why Zenith was chosen TPA (Union Trustees' Ex. A.1, Tr. 393), and appoint a full time manager for it in a dedicated space or separate office, if needed. It also stated it would use the automated Beacon SpyGlass system which it found superior to a number of listed systems to process claims.

Because CIGNA was being replaced, CIGNA would no longer provide its own network of medical providers, requiring the Plan to contract with another network for

3

California claims. It did so with Blue Shield. In the meantime, CIGNA, which had largely a paper system (Tr. 324), failed to cooperate on the handover to Zenith. One of its automated contractors failed to keep to an agreed schedule on transferring data to Zenith. As Zenith advised the Trustees (Tr. 356, *but see* Tr. 123), it was required, because of the need for interfaces between that contractor as well as Blue Shield with its system, that it was first going to use both the Beacon SpyGlass system, which featured reduced training time for inexperienced personnel (Tr. 602) and robust fraud detection (Tr. 82, Union Trustees' Ex. A.3) and its ATLAS system, a system not compared in its statement that Beacon SpyGlass would be used. (Union Trustees' Ex. A.3, Tr. 376), Zenith then went solely with ATLAS in order to deal with the late CIGNA data (Tr. 122, 355, 547, 606, 610), and building required interfaces. (Tr. 631, 633)

CIGNA stopped processing claims on December 3, 2012 rather than continuing through that month, leaving that month's backlog to be inherited by Zenith for processing, increasing unprocessed claims from the anticipated 15,000 to an unanticipated 89,000. (Tr. 353) It was discovered later, in hundreds of boxes of documents shipped to Zenith by CIGNA (Tr. 551), there was a box full of checks for providers without documentation that had to then be traced and distributed by Zenith. (Tr. 534) By December 2012, a number of Zenith's personnel then employed in 2010 had left (Tr. 537), leaving but eight San Francisco-based experienced employees to be assigned to the Plan. (Tr. 749) At the Trustees' request, in the meantime, Zenith was requested to hire CIGNA employees with experience handling the Plan's claims if they met Zenith's qualifications. (Employers' Trustees' Ex. B.2) Zenith did so, but CIGNA, even though no

4

longer processing Plan claims in December, declined to release them to be employed at Zenith without forfeiting their CIGNA severance pay. According, those employees could not be hired and trained by Zenith until early January 2013. (Tr. 535) In addition, the manager of the Plan at Zenith was not fully dedicated to it until late in January. (Tr. 729-730)

As Zenith took over the processing of claims, a number of severe efects became evident. Among them were that providers were dissatisfied because they were being paid at Blue Shield rates rather than more generous CIGNA network rates even though they were part of the Blue Shield network. (Tr. 549) Some advised their patients that their benefits were being cut even though they had not been, leading to consternation by participants that was unfounded but nonetheless of major concern to them. Other claims were inadvertently denied by being sent to the wrong address by providers. (Tr. 532-533, 569) Reasons for denial on explanations of benefits on claimant forms (EOB's) were obscure, wrong or unknown. (*E.g.,* Tr. 163, 281-282, 321) Providers also dumped claims previously denied by CIGNA into Zenith's system, to see whether Zenith would pay them anyway (Tr. 542), and those claims also had to be processed by Zenith. (Tr. 721) CIGNA-era claims now total 286,000, and increase 20,000 to 30,000 each month. (Tr. 540) Similarly, the number of current claims increased from the expected 14,400 to 22,000 per week. (Tr. 645) All 2012 and earlier claims had to be repriced by CIGNA, requiring another interface with Zenith's system, which could not begin to be built due to CIGNA's lack of resources until January 23, 2013. (Tr. 539) CIGNA also had not provided appropriate information about eligibility leading to claims being denied or

5

delayed to get further information. (Tr. 100, 736. *See also* Tr. 152) CIGNA's unprocessed claims contributed to Zenith's needing more personnel to handle claims and calls. (Tr. 366)

As a consequence, claims were either wrongly denied or were delayed. Some providers then balanced billed their patients for the services that would have been covered by the Plan. When uncollected, some claims were turned over to collection agencies, resulting, in some cases, in erosion of participants' credit ratings which, in turn, denied them loans or mortgage refinancing. (*E.g.*, Tr. 285, Union Trustees' Ex. Q.46)

Plan participants and beneficiaries, as well as providers, stormed Zenith's telephone system, overloading it with calls 175 percent in excess of what the RFP had called for, (*e.g.*, Tr. 723, 739, 765), resulting in calls being abandoned for not being timely answered (*see* Tr. 261, 724), as well as lack of problem solutions even if answered. Members and beneficiaries also turned to, or on, the jointly appointed Area Welfare Directors and Union officers whose pile of complaints mounted (Tr. 260, *see also* Tr. 341), and they, too, had trouble getting timely answers, often having to repeatedly fax the same problems several times. (Tr. 139) They pointed out that beneficiaries turning to them for aid included aged widows or members whose children had severe health issues, properly acting with grave and unaccustomed concern over claim delays or denials. (Tr. 320, 321, 341).

Zenith had contracted with TC3 to provide fraud screening for out-of-network providers as well as the First Choice network that was the network for Oregon and Washington. TC3 encountered claim-processing delays (Tr. 475), given the value of

6

claims of what it described as unprecedented evidence of fraudulent claims (Tr. 383),

primarily from Southern California for which it had to increase its staff.

The upshot was an April 3, 2013 joint letter from the Trustees reading in pertinent

part as follows:

> "We are writing to express some concerns regarding the transition of the Plan's claims administrative services to Zenith-American Solutions. Your company was selected to replace CIGNA as the third-party claims administrator for the ILWU-PMA Welfare Plan effective January 2, 2013.
>
> Throughout the RFP process, members of your leadership team, including the President, John Corapi, assured us that the transition from the former TPA, CIGNA, to Zenith American Solutions would be seamless. They assured us that Zenith American Solutions would dedicate the necessary resources to our new Coastwise Claims office to ensure a smooth transition and provide an efficient and effective claims administration for the Plan.
>
> In reality, some issues have arisen. The Trustees acknowledge that most if not all of the problems stem from the backlog of claims received from CIGNA--a great number of which were large and complex claims incurred throughout 2012. However, aside from processing 254,030 claims, which represents 85% of all claims received since January 2, including the 87,000 plus received from CIGNA, Zenith American Solutions has not met several of its important promises, including an adequately staffed office with trained customer service representatives and experienced claims processors; the timely implementation of an IVR [automated phone response] system; the timely transfer of claims' history data to certain of its vendor partners; the timely programming of its claims system to produce required plan reports; and timely obtaining a post implementation audit.
>
> In addition to overburdened claims processors and ill trained customer services representatives, there have been several IT set-up errors, which reportedly have been corrected. Unfortunately, these errors generated angry and frustrated calls from members and providers to the Claims Office, the Benefit Plans Office and Union Officers. The office continues to be understaffed, customer service and claims processing problems continue to persist, and members and providers calling the office are still encountering wait times of 20-40 minutes on a daily basis. We've seen correspondence sent to

7

our members containing the letterhead of an entirely different Union Trust Plan, and checks are being sent to our members instead of providers. The Trustees demand an assurance from you that Zenith America Solutions intends to fulfill its promises during this period of transition, and thereafter.

While we feel that Zenith American Solutions does need to devote additional resources to our Coastwise Claims Office, the Trustees also want to acknowledge the tireless efforts put forth by Becky Placek, Senior Client Services Manager. She works long hours daily to resolve member and provider issues. This includes working on most weekends and holidays since the transition began. However, she alone cannot provide the necessary and timely responses that are currently needed to effectively complete this transition. We ask that you meet with us soon to discuss how Zenith American Solutions intends to fulfill the promises made during the RFP process and since. ..." (Union Trustees Ex. G)

As a result of that letter, Zenith, including its CEO, Shultz, met with Trustees and devised an 18-point plan of improvement. (Employers' Trustees' Ex. F.5) Sixteen of those have been implemented with two still awaiting Benefit Plan Office or Trustee approval (Tr. 567), one delaying changes to EOB's for great clarity. (Tr. 564-565) According to Zenith, it has substantially reduced 2012 or earlier claims, including fully eliminating the December 2012 CIGNA unprocessed claims and the checks it received from CIGNA. It has reduced its telephone call abandonment rate to three percent, which it maintains is an industry standard. It has devoted extra personnel to unprocessed claims and is reexamining whether it has the appropriate amount of personnel. By using only experienced personnel, training advantages of the Beacon SpyGlass not being used was a nonfactor. (Tr. 611, 612) It will lease separate office space for Plan processing in San Francisco once its contract with the Trustees is finalized. (Tr. 619) It has provided designated personnel as points of contact with the Area Welfare Directors (Tr. 561),

8

leading to increased responsiveness to the issues they have raised. (Tr. 136, 146, Employers' Trustees' Exs. I, J. *See also* Tr. 151)

TC3 also maintains that it has increased personnel and decreased claims processing time. (Tr. 488) It has identified one fraudulent Southern California provider and is investigating several others, although it maintains it takes six months or longer to build a fraud case. (Tr. 467) In addition the Trust has sued providers, and the federal government is investigating others.

An independent audit of Zenith by Lindquist LLP, chosen by Milliman (Tr. 357), noted on July 15, 2013, that it had not "discovered any major areas of concerns regarding the implementation and conversion as it pertains to the scope of testing." (Union Trustees' Ex. M) A month later, in its final report received after the briefing in this matter had been completed, Lindquist did not recant that statement, although it reached additional conclusions which will be discussed below.

POSTIONS OF THE PARTIES:

Position of the Union Trustees:

That the fiduciary duties required of the Trustees by Section 404 of ERISA mandates that they act solely in the interests of the Plan's beneficiaries and participants including with respect to the appointment and monitoring of claims administrators; that, accordingly, the problems engendered by Zenith demand immediate and decisive action at the period of fiduciary breach; that Zenith has lied and broken critical promises, including those on which its selection was based including staffing, the key point of that

selection, by disclosing in August 2012 that it needed 49 new hires utilizing but six experienced claims personnel; that short staffing has continued at Zenith as well as TC3; that the abandonment of the SpyGlass system showed Zenith's misrepresentation of its response to the RFP by Zenith which was not disclosed until April 2013, still without explanation of its substitution of the inferior ATLAS system; that a further lie was that Zenith would establish a dedicated office physically independent of its current facility; that Zenith did not, as promised, provide a dedicated manager to the Plan; that the Lindquist report confirms the continuing organizational dysfunction within Zenith; that TC3's mismanagement of prepayment fraud review is a major factor for delays and defects in claims processing without a single case of suspected fraud actually presented so that it was a colossal error in judgment by Zenith and TC3 to not adopt a "pay and chase" form of fraud detection to avoid backlog and bottlenecks of claim delays; that Zenith has not been neutral but has excluded the Union Trustees in preparation of this arbitration, including Zenith's response to Union Trustees' subpoenas, furthering the lack of trust and confidence that Area Welfare Directors and the Union Trustees are clearly entitled to have; that the crucial question is, notwithstanding the challenges that the change of TPA presented, whether Zenith can be relied upon to properly service the Plan where the evidence shows that Zenith would be at the peril of fiduciary breach; that TC3 cannot be fairly separated from the problem of remedy but must be replaced as well where the Plan has no relationship with TC3.

<u>Position of the Employers' Trustees:</u>

That Zenith, and TC3, are currently meeting their performance standards in terms of accuracy, turnaround time, phone calls answered and call abandonment; that the number of complaints have diminished given that CIGNA claims are being resolved and providers understand that Blue Shield provides deeper discounts than CIGNA did; that Lindquist did not discover any major areas of concern in its audit so that there should be no major upheaval by inserting a new TPA at this point, as also attested to the Plan's consultant; that the wrongs of CIGNA and unscrupulous providers were the primary causes of initial claims processing problems; that Zenith and TC3 were faced with provider fraud, tolerated by CIGNA, that is at an unprecedented level which were matters outside Zenith's control; that Zenith's reaction to these problems and those raised by the Union Trustees, participants and beneficiaries and Area Welfare Directors has been positive, with remarkable actual improvements; that but a small percentage of claims have been denied due to suspected fraud; that TC3 has not unduly delayed claims processing; that TC3 was not hired to pay and chase fraud, and to have it do that now would violate the Trustees' fiduciary responsibilities; that Zenith has adequately staffed its offices with experienced, trained personnel; that a completely dedicated office was promised if needed and Zenith will provide one going forward; that the change to ATLAS was done with full knowledge of the Trustees and was necessitated by the circumstances at the time; that, in any event, that here has been no evidence that the switch in systems has affected the operation of the Plan; that there has been no underproduction of claims compared to projections as asserted.

11

DISCUSSION:

Trustees' Obligations:

As all Trustees recognize, citing ERISA, 29 USC §1104(a)(1) *et seq.*, they have a fiduciary duty to the Plan's participants and beneficiaries

> "in accordance with its provisions. In doing so, in terms of administration, their duties would include that claims are handled expeditiously, accurately, and economically, and that the assets of the trust be dealt with honestly, including, where possible, to not pay claims to fraudulent providers." (Impartial Umpire Decision *re* TPA selection, June 4, 2012, pps. 8-9)

Trust Violations:

There are two aspects to the trust placed in Zenith: Its selection and its performance.

As to selection, that Zenith did not live up to its obligations is clear, although there were mitigating circumstances, including the necessity to switch to ATLAS. But as to other representations, including that which landed the job for Zenith, it fell short. Staffing with its own experienced claims personnel was deficient, as was its dedicated manager from the outset of the conversion. What these unmet RFP promises raise is a major issue as emphasized by the Union Trustees. The fact is that they did not move to replace Zenith when Zenith was most vulnerable. (*See also* Tr. 105, 106) Rather the Trustees took a higher road in their April 3 letter. They acknowledged that which was factual, namely that CIGNA left Zenith holding its bag, and the Trustees have viable legal claims against that organization. In addition, they acknowledged the now-full time manager's dedication to make the conversion work.

Zenith's post-April 3 efforts were belated. The April 3 letter should have been unnecessary, for Zenith should have taken its post-letter positive steps on its own well before the letter was written. Nonetheless, those have now shown evidence of becoming effective.

The questions at this point in time are whether, first, the obligations to the members and beneficiaries will be better served by retaining or switching TPA's. The second is whether, given Zenith's past somewhat delayed approach to its staffing obligations (*compare* Tr. 626, 627 *with* Tr. 644), and past representations resulting in questioning its trustworthiness, it can be trusted to continue the progress it has made since April 3 into the future.

As to the first, the evidence in the record shows not only the improvement in performance noted above, but also, with some further adjustments, the promise of meeting all goals. Given that state of the record, the evidence is against changing TPA's at this point in time. Davidson, the Trustees' mutually employed Plan consultant, testified he saw no basis to change TPA's given the disruption that such a change would involve:

> "Q. [by Mr. Liebman, Counsel for the Employers' Trustees] What would be the impact on the Trust Fund to replace a TPA at this point in time?
>
> A. Whew. We would be starting all over again. We would be starting from where we were in November, December of last year in trying to pull together enough data so they could do the job. *I think it would be very disruptive to the members* -- I mean not that it couldn't be done, anything can be done *but if things are getting a little better as we go along, why go down that road?* ..." (Tr. 362, italics supplied)

13

Lindquist's July conclusion of no major deficiencies must be taken into account. Similarly, other expert testimony supports that conclusion.

As to the second, given that this decision is considered an interim decision with a future hearing scheduled, there will be the ability to test Zenith's commitment to proper service, including testing such issues as continued low call abandonment rates, claims backlogs, multiplicity of filing other insurance coverage and other forms (Tr. 102, *but* see Tr. 553), proper staffing (Tr. 728, 767), claims paid versus projections (Tr. 359-360, 386-392, Union Trustees' Exs. C.17, O), timely and accurate reports (Union Trustees' Exs. I.6-.8), and late submissions of some claims to TC3 from Zenith (Union Trustees' Ex. S). Similarly tested can be continued responsiveness to Area Welfare Directors (Tr. 727), particularly with respect to chiropractic (Tr. 725), acupuncture, vision and birth control claims (Tr. 132, 148), as well as weekly indemnity payments. (Tr. 205, *but see* Tr. 726) Requirements for verification of at least some of these issues are listed in the interim decision below.

Fraud:

There are two ways the Plan can deal with fraud. One is to "pay and chase", or prepay, namely pay all claims and seek to recover fraudulent or otherwise improper payments later. The other is post-pay, to not pay suspect claims until they are investigated for appropriateness. Zenith stated it would do either as the client preferred. (Tr. 82, *see also* Union Trustees' Ex. A.4)

In this case, Zenith, who had contracted with TC3 as known to the Trustees on selection, directed TC3 to do the latter. According to the Union Trustees, this choice has been a principal cause of claims not being paid either timely or at all.

According to this record, post-pay fraud investigation has been the norm since Zenith was selected (Tr. 609), and has been well known to the Trustees. This record shows that that method of dealing with fraud, particularly fraud that may be endemic with out-of-network providers in Southern California, is the appropriate method of dealing with fraud to avoid making payments to crooks. (Tr. 430) Three percent of all California claims require particular attention, with longer, sometimes substantially longer, processing time, versus less than 0.1 percent of claims nationwide. (Tr. 441) In any event, TC3 stated it has increased staff (Union Trustees' Ex. I.2) and reduced its delay time in processing claims, which can also be monitored as a result of this decision.

What the Trustees themselves, faced with what this record shows occurs in Southern California, have to develop is a timely way to mitigate collateral damage where a claim is held up because of suspected fraud, but where the member or beneficiary is not complicit in it. They would have an obligation to mitigate situations where a fraudulent provider would balance bill an innocent claimant, or allowing that bill to go to a collection agency. (*See* Tr. 506, 508)

Audit:

As noted, the final Lindquist audit was not received until after briefing on August 15, 2013. In its narrative, Lindquist did not specifically retract its earlier conclusion that there were no major concerns, but, among other matters, did raise a significant new issue

15

concerning whether the system coding was different from the Summary Plan Description. Lindquist noted that corrective action has been implemented where Zenith agreed with Lindquist. (App. A, *see also* Tr. 148, 556 *re* well-baby care) As with other matters of concern, Zenith's reaction to the final audit can be assessed at the continued hearing in this matter.

INTERIM DECISION:

1. A decision whether to replace Zenith as TPA with BeneSys is premature at this time.

2. This matter is continued until November 11 and 12, 2013 at 10 a.m. at PMA in San Francisco.

3. Zenith, in the interim, will:

    a. Forthwith provide a dedicated point of contact for Local 13's Health Benefit Officer as it has done for the Area Welfare Directors;

    b. On spreadsheets provided the Health Benefit Officer and Area Welfare Directors, Zenith's point of contact personnel shall forthwith note for each referred claim the date received so that Zenith's time to deal with each problem can be assessed (Tr. 138, 313);

    c. Provide by October 1, 2013 a report to the Trustees, Counsel and the undersigned stating:

        1. Staffing levels of the San Francisco office;

        2. Phone call abandonment levels;